debt for which B was his security, but (as in the pre-
sent case,) to the payment of the private and sepa-
rate debts of B himself, leaving A afterwards to pay
his debt in the best manner he could.  Nor is the
executor of a deceased partner without remedy.  If
he really apprehends danger, he may apply to a court
of chancery to compel an immediate settlement of
the partnership by the surviving partner, and upon
good cause shewn, may have a receiver appointed.
The case then is this—partnership property to the
amount of 1238*l* 15*s* 11*d*, has been taken by the de-
fendant, and applied to the payment of the *separate
creditors* of the testator, or rather in reality to paying
himself, as the *executor* of *William Petty*, a separate
debt due to him by *John Petty*, the deceased partner,
when not one farthing ought to have been so applied;
and that the surviving partners have received no part
of that amount, when in fact they were, both in law
and equity, entitled to the whole.  The question then
for the chancellor to decide is, whether, under all
these circumstances, the complainants are not entitled
to redress?

Hanson, Chancellor, (May term, 1799,) decreed,
that the complainants' bill of complaint be *dismissed*
without costs.  From which decree the complainants
appealed to this court; but the case at this term was
entered *agreed*.

## GENERAL COURT, (E. S.) SEPT. TERM, 1800.

### Russell's Lessee *vs.* Baker.

Ejectment for a tract of land called *Clayfall*,    The Lord Pro-
lying in Cecil county.  Defence was taken upon plots    prietary had not
made and returned in the cause.    the royal rights of
the King of G. B.
1. The plaintiff, at the trial, offered in evidence to    and he might be<br>barred by the act<br>of limitations and<br>adverse possession
of lands, which he claimed by escheat, &c.

Where the Lord Proprietary, and J. Y. were tenants in common of a tract of land in 1686, at the
time when the Proprietary was in Maryland, where he remained for two years thereafter, and J. Y.
entered upon and claimed the whole tract adverse to the right of the Proprietary, &c and where J.
Y. and those claiming under him, had the uninterrupted possession of the land, claiming the whole
from the year 1687 to 1780—Held, that the Lord Proprietary was barred by the adversary possession of
J. Y. and those claiming under him.

the jury, a lease from the *Lord Proprietary* to *Samuel Thomas*, junior (a), dated the 24th of December 1748, for 540 acres of land, part of his Lordship's manor of *Susquehanna, alias New Connought*, lying in Cecil county, for and during three lives, viz. the life of the said *Thomas*, and of *Richard* and *John Thomas*, at a certain annual rent. That the said *Samuel Thomas* died in July 1784, having by his will devised the lands in the said lease mentioned to his daughter, *Anne Russell*, the lessor of the plaintiff. That *John Thomas* mentioned in the said lease is yet living. The plaintiff also gave in evidence a grant from the *Lord Proprietary* to *Francis Wright*, dated the 19th of September 1659, for 500 acres of land called *Clayfall*, "lying at the head of Chesapeake Bay, on the N. side of the said bay, &c. formerly laid out for *Francis Clay*, but for nonperformance of conditions, again fallen into our hands." And that the land therein mentioned is the same land as is contained in the said lease, and that the said land is truly located on the plots returned in this cause. The plaintiff also offered in evidence, the will of the said *Francis Wright*, dated the 25th of July 1666, whereby he devised unto his brother *Raphael Wright*, of Covill, in the parish of St. Andrew's in Glamorganshire, in Wales, his house and lands known by the name of *Clayfall*, in the county of Baltimore, with all things thereunto belonging; and that when his said brother should arrive in the country, that he cause the land and house, and all the negroes, &c. to be appraised, &c. and the one half of the amount so ascertained, he gave by his said will unto *Jacob Clawson de Young*, late of this province, &c. and the will also provided, that in case his said brother *Raphael* should die before he came to enjoy the said land, &c. that then the said premises as he gave them to his brother *Raphael*, should go unto his brother *Thomas Wright*, and to his heirs, for ever, &c. The will was proved on the 20th of March 1667, by the *two* witnesses who attested the execution there-

(a) See the lease mentioned in the case of *Thomas' Lessee vs. Hamilton*, 1 *Harr. & M'Hen.* 190.

of. The plaintiff also gave in evidence, that the said Francis Wright died in the year 1667, without heirs, and that thereby the whole, or a moiety of the said land granted to the said Wright, escheated to the Lord Proprietary; and to prove the same, the plaintiff read in evidence to the jury, a record of the proceedings in an action of ejectment brought in the late provincial court by Samuel Thomas's Lessee against John Hamilton, for his Lordship's manor of Susquehannah, or New Connought, lying in Cecil county, and judgment rendered therein at April term, 1752; [see 1 Harr. & McHen. 190,] wherein it is stated in the bill of exceptions taken at that trial, "that the said Francis Wright in the year 1667, died seised of the premises in the declaration, without heirs, whereby the land escheated to the Lord Proprietary." The plaintiff further gave in evidence, that the said John Hamilton, (the defendant in the said action of ejectment in the record aforesaid mentioned,) was rector of the parish of St. Mary Ann, to the vestry of which said parish a deed had been executed by a certain John Currier, and Meliscent his wife, on the 7th of June 1748, "for a part or moiety of a certain tract of land called Poplar Neck, being part of a tract called Clayfall," containing 100 acres, and that the said John Currier held the said part of Clayfall, and claimed the same under a deed from Jacob and John Young, dated the 7th of May 1748. The plaintiff then gave in evidence two grants from the Lord Proprietary to George Talbot, one for the manor of Susquehannah, containing 32,000 acres, lying in Cecil county, and dated the 11th of June 1680, and the other a grant of confirmation for the said land called Susquehannah Manor, alias New Connought Manor, containing 32,000 acres, and dated the 22d of March 1683. The plaintiff also gave in evidence a deed from the said George Talbot to Jacob Young, the devisee in the will of the said Francis Wright, dated the 10th of June 1687, reciting that Francis Wright died possessed of 250 acres of land in a tract called Clayfall, and leaving no lawful heirs after him, nor having made any written testa-

ment before his decease, the same became escheatable to the Lord Proprietary, and that the Lord Proprietary by patent dated the 11th of June 1680, and also by a patent of confirmation of the 21st of March 1683, granted to the said *Talbot* all that tract of land called *Susquehannah*, alias *New Connought* Manor, saving to all persons who had former patents of any land within the natural bounds of the said manor the full benefit of their respective patents, they paying to the said *Talbot* the rent of, &c. by which grant the escheat of the said 250 acres in *Clayfall* aforesaid, became the right of the said *Talbot*; and that the said *Talbot*, in consideration of, &c. granted, &c. to the said *Jacob Young*, his heirs and assigns, for ever, all his right, &c. in and to the said 250 acres of land, and the escheat thereof, upon account of the want of heirs or assigns deriving title to the same from the said *Francis Wright*, deceased. The plaintiff then gave in evidence a record of the conviction of the said *George Talbot*, which states, that the said *Talbot* had been convicted, and a judgment rendered against him in the general court of the then colony of *Virginia*, on the 20th of April 1686, for stabbing, contrary to the statute in such case made and provided, a certain *Christopher Rousby*, in the year 1684, on board of his Majesty's ketch the *Quaker*, riding in the capes of Virginia; the record also states, that the said *Talbot*, on the 20th of April 1687, presented his majesty's most gracious pardon, which was received. The plaintiff also gave in evidence, that the Lord Proprietary left the then province of Maryland, and went to Europe, some time in the year 1688; that about that time a civil war took place in Maryland, and an armed force took possession of the colony of Maryland in favour of King *William* and Queen *Mary*, and that a convention appointed thereby assumed the powers of government in the said colony; that the government of the said colony was exercised by the Kings and Queens of Great Britain until the year 1716, when it was again restored to the Proprietary: and that the said Proprietary did not return to the colony until some time in the year 1732,

Sept. 1800

Russell
vs.
Baker.

That the said Lord Proprietary claimed the said lands leased to the said *Samuel Thomas*, as part of the manor of *Susquehannah* or *New Connought*, which he claimed as vested in him by the conviction and attainder of the said *Talbot*. That the record of the said conviction was not transmitted to the colony of Maryland, and made a record of that colony, until in the year 1717.

The defendant then offered in evidence the will of the said *Jacob Young*, dated the 22d of February 1696, whereby he devised to his son *Joseph*, the plantation which he then lived on, &c. and also the will of the said *Joseph Young*, dated the 10th of April 1727, whereby he devised to his sons *Samuel* and *William*, and their heirs, for ever, all that plantation he then lived upon; and to his sons *Jacob*, and *John*, and their heirs, for ever, all that plantation which was commonly called *Poplar Neck*, then in his possession; and to his son *Joseph*, and his heirs, for ever, all that plantation called *Hanleys*, &c. The will also provided that his said sons should not give, sell nor dispose of the said lands, except to each other, or to their children. The defendant further gave in evidence, that the said *Joseph Young*, the testator, died leaving five sons, to wit, *Samuel*, the eldest; *Joseph* the second; *John*, the third; *Jacob*, the fourth; and *William*, the fifth and youngest. That *Samuel* died leaving two daughters, *Mary* or *Polly*, and *Prudence*, and a widow; that the widow intermarried with one *Fogg*; that *Mary* intermarried with one *Douglass*, and *Prudence* with one *Clark* or *Jones*; that *John* died intestate, and without issue, leaving a widow, who afterwards intermarried with one *Foster*; and that *Jacob* and *John Young* executed to *John Currier*, the deed before mentioned; and also gave in evidence the before mentioned deed from *John Currier* to the *Vestry of St. Mary Ann's Parish*; and also gave in evidence, that he, the defendant, claimed the said land called *Clayfall*, under the title of the devisees of the said *Joseph Young*, and under the deed to the said *Vestry*; and that the said *Jacob Young* was in possession of a moiety of *Clayfall* aforesaid, at

the time of the conviction and attainder of the said *Talbot;* and that after the said deed from the said *Talbot* to the said *Jacob Young,* he the said *Jacob* did possess the said tract of land, claiming a right to the whole thereof, until his death; and that the said *Joseph,* his son, after the death of *Jacob,* and in virtue of the said will, entered upon, and was in possession of the said tract, claiming the whole thereof until his death; and that the said sons of the said *Joseph,* in virtue of his will, respectively entered upon and were in possession of the parts devised to them of the said tract called *Clayfall,* after the death of the said *Joseph,* by themselves and their aliences, claiming the whole of the said tract, until the year 1780. The defendant further offered in evidence, copies or extracts from the *debt books* of Cecil county, and the *rent rolls,* remaining in the land office, duly authenticated. By the *rent roll,* in 1737, it is stated, that *Clayfall,* 500 acres, was surveyed for *Francis Clay,* and possessed by *Samuel Young.* By the *debt books* in 1737, it is stated, that part of *Clayfall,* 250 acres, was charged to *Jacob Young,* and another part, 250 acres, charged to *Joseph Young.* In 1739 the whole is charged to *Samuel Young.* In 1749, 100 acres were charged to the *Vestry of St. Mary Ann's Parish;* 200 acres to *Amos Fogg;* 100 acres to *Thomas Foster,* and 100 acres to *Joseph Young.* In 1754 and 1755 the same charges. In 1758, the same, except that *Henry Baker* was charged with the parts before charged to *Fogg* and *Foster.* In 1761, 100 acres charged to *Henry Baker;* 300 acres to *Amos Fogg, John Douglass,* and *John Clarke,* and 100 acres to the *Vestry of St. Mary Ann's Parish.* In 1767, the same charges. In a book, without date, 400 acres were charged to *Jeremiah Baker,* and 100 acres to the *Vestry, &c.*

Whereupon, the defendant by his counsel prayed the court for their opinion and direction to the jury, that the Lord *Proprietary,* and *Jacob Young,* on and after the conviction of the said *George Talbot* in 1686, were tenants in common of the tract of land called *Clayfall;* and if the jury find that the Lord

Proprietary was in the then province (now state) of Maryland, at the time of the said conviction, and for two years thereafter, and at the time of the deed from the said *Talbot* to *Young* in 1687; and if they are of opinion that *Jacob Young* entered upon and claimed the whole of the said land adverse to the right of the Lord Proprietary, until his death in 1696, and that he devised the said land to his son *Joseph,* and that his son *Joseph,* in virtue of the said will, entered on the said land, claiming the whole thereof adverse to his co-tenant, the Lord Proprietary, and continued such possession until his death in 1732; and if they further find, that the said *Joseph* died in possession of the said land, claiming the whole, and devising the whole as his own proper estate to his five sons, and that his said five sons, in virtue of his said devise, entered upon and possessed the said land, claiming the whole thereof adverse to the title of the Lord Proprietary, and as their own proper estate, and continued the said possession by themselves, or their alienees, claiming the same adverse to the title of the Lord Proprietary, and as their own proper estate, and continued the possession thereof down to the year 1780, notwithstanding the lease to *Samuel Thomas;* and if they further find that the said Lord Proprietary, by his agents and officers, accepted from the devisees and alienees of the said *Joseph Young,* and his sons, quit-rents for the whole of the said land, from the year 1733 until the year 1767, and that *Jacob Young* and *Joseph Young,* and those claiming under them, had the uninterrupted possession of the said land, and the receipt of the rents and profits thereof, claiming the whole of the same as their own, from the year 1687 to the year 1780, that then the plaintiff is not entitled to recover.

CHASE, Ch. J. *(a.)* The court are of opinion, and direct the jury, that in case they find the facts stated by the defendant to be true, that then the plaintiff hath not made out title to the land for which this

*(a) Duvall* and *Done* J. concurring.

SEPT. 1800

Russell
vs.
Baker

The Proprieta-ry being barred of his right to escheat land by *limitations* —his lease inope-rative to pass the same, &c.

ejectment is brought, nor to any part thereof, although they should find the facts stated by the plaintiff to be true. The plaintiff excepted.

2. The plaintiff, by his counsel, then prayed the court for their opinion and direction to the jury, (upon the statement aforesaid,) that although the Lord *Proprietary* and *Jacob Young*, on and after the conviction of the said *Talbot* in 1686, were tenants in common of the tract of land called *Clayfall*; and although the jury should find that the Lord Proprietary was within the province (now state) of Maryland, at the time of the said conviction, and for two years thereafter, and at the time of the deed from *Talbot* to *Young* in 1687, and that *Jacob Young* entered upon and claimed the whole of the said land adverse to the right of the Lord Proprietary, until his death, and that he devised the said land to his son *Joseph,* and that his son *Joseph,* in virtue of the said will, entered on the said land, claiming the whole thereof adverse to his co-tenant, the Lord Proprietary, and continued such possession until his death; and although they should further find that the said *Joseph* died in possession of the said land, claiming the whole, and devising the whole, as his own proper estate, to his five sons, and that his said five sons, in virtue of his said devise, entered upon and possessed the said land, claiming the *whole* thereof adverse to the title of the Lord Proprietary, and as their own proper estate, and continued the said possession by themselves, or their alienees, until the time when the said lease was made by the said Lord Proprietary to the said *Samuel Thomas;* and although they should further find that the said Lord Proprietary, by his agents and officers, accepted from the devisees and alienees of the said *Joseph Young,* and his sons, quit-rents for the whole of the said land, from the year 1733 until the time of the execution of the said lease to the said *Thomas,* and that *Jacob Young* and *Joseph Young,* and those claiming under them, had the uninterrupted possession of the said land, and the receipt of the rents and profits thereof, claiming the whole of the same as their own from the year

1687 to the time of making the said lease to the said
Thomas, that then notwithstanding, the lease of the
said land by the Lord Proprietary's agent to the said
Samuel Thomas was operative to pass an estate in the
said lands, the said Lord Proprietary only claiming
the same as part of the said manor.

CHASE, Ch. J. The Court are of opinion, that the
lease from the Proprietary to Samuel Thomas is not
operative to pass the land called Clayfall, nor any
part thereof, to the said Samuel Thomas; and that the
plaintiff has failed to make out title to the land for
which this ejectment is brought. The plaintiff ex-
cepted. Verdict for the defendant, and judgment
thereon. The plaintiff appealed to the court of ap-
peals; and the case came on for argument in that court
at November term, 1803.

Martin, (Attorney General,) for the appellant. In
this case two prayers were made to the general court,
the first by the defendant, and the other by the plain-
tiff; and the opinions given by that court upon both
prayers were, that the plaintiff was barred by limita-
tions from recovering. The opinion in the first bill
of exceptions is, that the lessor of the plaintiff was
barred; and in the second, that at the time of the lease
by the Lord Proprietary to Thomas, the Lord Pro-
prietary was barred.

1. The first point was, whether or not the Lord
Proprietary could be barred by limitations?

2. The second, Whether or not the Lord Proprie-
tary could be barred by the possession of the persons
mentioned in the bill of exceptions, so as to preclude
his making the lease to Thomas? And

3. The third, Whether or not the Lord Proprietary,
having no interest in the land at the time, could make
the lease to Thomas?

The general court considered, that the case of
Kelly's Lessee vs. Greenfield, (2 Harr. & M'Hen. 121,)
decided the questions in this cause. It was therefore
adjudged without argument. The case of Kelly vs.
Greenfield however, has never been acted upon by the

Sept. 1800

Russell
vs.
Baker

court of appeals, nor has any point been decided in this court which will preclude an investigation of the questions arising in this cause; neither was any opinion given in the case of *Kelly vs. Greenfield* by the general court, by which this case can be affected. The opinion which has gone forth as the opinion of the general court in that case, was a mere *dictum* of the then Chief Justice *Harrison*, and had nothing to do with the case before the court. It was one in which the other judges did not concur, as will appear by a statement of one of them, (the present chancellor *Hanson*,) in 2 *Harr. & M'Hen.* 140. The decision there turned upon the point of *relation*, and the judgment given was a correct one. But as the court decided that the patent offered in evidence by the defendant should relate to the certificate, and that therefore the plaintiff could not recover, there was no necessity for them to determine whether or not the Lord *Proprietary* was barred by limitations, since that question could only arise from their having decided that the patent should not have such relation. If the *Proprietary* grants land, though not under the proper warrant, yet so long as the grant is unrepealed, it is good. He had a right to dispense with the rules of his land office, and grant land which was liable to escheat to any person who might take it up under a common warrant. He might have repealed the grant on account of deception, if there had been any used; but until the grant was repealed, he was bound by it, and could not grant the same land to any other person. The opinions of Chief Justice *Harrison* are entitled to very great respect. He was a gentleman of great legal information and moral worth. Certain points decided by him in the case referred to, are certainly correct, such as the *five first points*; all of which go completely to decide the case in favour of the defendant. But the decision upon the *sixth point* was on matter *dehors* the record, and was not demanded by the case before him. The opinion upon the *seventh point* may be proved an incorrect opinion, and there is no authority in support of the decision upon the *eighth point.*

Opinions, which have no relation to the case to be decided, or are not necessary to be given, are to be considered as mere *dicta* of the judge, and not as judicial determinations. *Vaugh. Rep.* 382. On its being suggested that the general court had, in the case of *Kelly vs. Greenfield,* decided that the Lord *Proprietary* was barred by the statute of limitations, Chancellor *Hanson* thought fit to protest against such a suggestion, and pronounce it unfounded. We admit that all the points which are stated to have been decided in the case of *Kelly vs. Greenfield,* were raised by the counsel. But it is wholly immaterial how many points were raised, if it was unnecessary to decide on all of them.

[The Court of Appeals stopped the attorney general, and *Potts,* J. said that the opinion stated to have been delivered in the case of *Kelly vs. Greenfield* is to be considered as the deliberate opinion of the general court as delivered by Ch. J. *Harrison.*]

Let us now inquire, what were the rights of the Lord *Proprietary?* He was invested by the charter of *Maryland* with all the rights which the king had; "with all and singular such, and as ample rights, jurisdictions, privileges, prerogatives, royalties, liberties, immunities, and royal rights, and temporal franchises whatsoever, as well by sea as by land, within the region, islands, islets and limits aforesaid, to be had, exercised, used and enjoyed, as any *Bishop* of *Durham,* within the bishoprick or county palatine of *Durham,* in our kingdom of England, *ever heretofore hath had,* held, used or enjoyed, or of right could or ought to have, hold, use or enjoy." *4th clause of the Charter of Maryland.* It becomes necessary then to investigate what royal rights were ever granted to the *Bishop* of *Durham,* in order to find out what have been granted to the Lord *Proprietary* of *Maryland.*

Before the statute 27 *Hen. VIII. ch.* 24, the Bishop of *Durham* was *as a king,* and might pardon all maters, and had *jura regalia,* but that statute took away part of his privileges. 6 *Vin. Ab.* 574, 575. That

statute however did not affect the Lord *Proprietary* of *Maryland*, because he was vested, under the charter, with all the rights which any *Bishop* of *Durham ever* had. With respect to royal rights and prerogatives, he cited *Cro. Jac. 512, 513. Cowper*, 108, 175, 213, 520, 521, 4 *Inst.* 204, *Davis's Rep.* 62. *Jacob's Law Dict.* tit. *Regalia.* The Lord *Proprietary* of *Maryland* might have been aptly styled a king, for he had right to make war and conclude peace. He had more power than the state of *Maryland* now has. 12*th clause of the Charter.* "Counties palatine, (1 *Blk. Com.* 118,) are so called *a palatio*, because the owners thereof, the Earl of *Chester*, the Bishop of *Durham*, and the Duke of *Lancaster*, had in those counties *jura regalia*, as fully as the king hath in his palace; *regalem potestatem in omnibus*, as *Bracton* (l. 3, c. 8, §. 4,) expresses it. They might pardon treasons, murders and felonies; they appointed all judges and justices of the peace; all writs and indictments ran in their names, as in other counties in the king's; and all offences were said to be done against their peace, and not, as in other places, *contra pacem domini regis.*" 4 *Inst.* 204. 6 *Vin. Ab. 575.* The Lord *Proprietary* had a right to grant titles of nobility. He was the fountain of all honours, and had the same powers in *Maryland* as the king had in *Great Britain*, and was always considered in *Maryland* as standing in the same situation which the king held in *Great Britain*(a). All laws, writs and commissions, were in his name, and the *Calverts*, who governed the province, were as careful and as attentive to the interests of the subjects here, as the king was in *Great Britain*, and the people of the province were as happy under *the reign of the Calverts*, as the people ever were under the reign of any of the kings of *England*. As to titles *in pais*, limitations were never considered as extending to the Lord *Pro-*

(a) The special verdict in the case of *Brerewood's Lessee vs. Jenifer, Agent of the Lord Proprietary*, states, that the Lords Proprietary of the Province always claimed and exercised royal rights in the province, flowing from the charter, and that the courts of law adjudged them to have such rights. So also in *Calvert's Lessee vs. Eden et al. 2 Harr. & M'Hen.* 279.

*prietary,* and there is no instance of his being barred, except it was expressly provided for by act of assembly. This is the well known principle in all criminal prosecutions; and with respect to landed interest, there never was a notion entertained, that the title of the *Proprietary* was barred by limitations, or adverse possession. This court must decide now, in the manner the case would have been decided before the revolution. It was never thought that the Proprietary was obliged to bring a writ of escheat; and no instance can be shewn, where a writ of escheat was brought; but the universal practice and understanding has been, that if land escheated to the Proprietary, the right immediately accrued to him without any act on his part. He adopted certain rules in his land office, by which escheat and other lands belonging to him, were to be granted; and it was never supposed that improved ungranted lands, no matter how long possessed by any person, could not be taken up as vacant; nor that to grant escheat lands there was first a necessity for an office found. In the case of *Thomas's Lessee vs. Hamilton, (*1 *Harr. & M'Hen.* 190,) it was determined, that the grant operated so as to convey the escheat land. No person could obtain possession by entering upon the lands of the Proprietary, so as to bar his right, no matter for what length of time such possession continued. It was *an intrusion,* and not a legal possession. This point was decided in the case of *Lux's Lessee vs. Pellett, et al.(a )* in the general court at *May term* 1791, where it was determined that the possession of the defendants of lands, not granted,

Sept. 1800

Russell
vs.
Baker.

(a ) *Lux's* Lessee vs. *Pellet et. al.* General Court May Term 1791 *Ejectment* for a tract of land called *Bell Hatch,* lying in Baltimore county. Defence was taken upon warrant, and plots were made. Verdict for the plaintiff as to part and for the defendant as to the residue, at September term 1774. The following *point* was saved for the opinion of the court thereon, viz. The plaintiff, to make out his title, shewed in evidence the certificate of survey and grant for the land mentioned in the declaration in this cause; and also shewed in evidence the will of *Nicholas Ruxton Gay,* the grantee of the said land, whereby the said land is devised, or mentioned to be devised to the lessor of the plaintiff.

The defendants gave in evidence, that they were before and at the time of the date of the said certificate of survey, in the actual occupation of the said land mentioned in the said certificate and. grant; and that after the date of the said certificate, and before

Where D. is in possession of vacant land, which the Proprietary afterwards grants to P. who enters, but is ousted and continued out of possession at the time of making his will and death—Held that the possession of D. was an *intrusion,* and that P. was not *disseised,* but that the land passed by his will to his devisees.

Sept. 1800

Russell
vs.
Baker

did not bar the Proprietary, nor those claiming under his grant. The Proprietary could never be disseised —no act of an individual could disseise him in contemplation of law. He was the original proprietor, and no one could be seised but under him. To show that the king could not be disseised, cited 4 *Bac. Ab.* 200, and as applicable to the Lord Proprietary, 4 *Bac. Ab.* 198. On an escheat for the want of heirs, the law gives the possession to the king *without office found. Plow.* 229, 230. A grant is to be taken most strongly against the grantor, and in favour of the grantee. The king may grant a *chose in action. Plow.* 243, 249. Nobody can *disseise* the king. He may be *wrongfully dispossessed,* but the intruder's injurious possession is *sine aliquo vestimento,* and called an *intrusion.* 1 *Burr.* 109. So if lands belong to the king by attainder, or other title, though they are concealed, &c. the king may, when discovered, grant them to another; for no time runs against the king. 4 *Com. Dig.* tit. *Prerogative,* 414, *(D.* 65,*)* 415, 417, 460. 3 *Co.* 10, *b.* The king, as well as a common person, may make a grant of all lands, &c. which are vested in him. He may grant land coming to him by descent

the date of the said grant, to wit, in the year 1765, several persons, by the command, and as the servants of the said *N. R. Gay.* entered on the said land, in houses thereon then being, and therein resided as under the right or title of the said *N. R. Gay,* for the space of ten weeks or two months, and not longer; and that *Francis Philips,* as servant and agent of the defendants, ousted the said servants of the said *N. R Gay;* and that the defendants have always since continued in the occupation of the said land, claiming the same as their right and property. It was not proved that the said *N R Gay,* or any other person, ever made any other entry on the defendants, or disturbed their said occupation of the said land.

The defendants thereupon objected; that the devise to the lessor of the plaintiff is void, because, as they allege, the said *N. R Gay* was, by the acts aforesaid, disseised of the said land, and was continued disseised at the time of his making his will aforesaid, and at the time of his death, which was in the year 1770. The consideration of which point is reserved for the opinion of the court, &c.

*S. Chase,* for the Plaintiff.

*Martin,* (Attorney General,) for the Defendants.

The General Court, [*Goldsborough & J. T. Chase,* J. *(a )*] gave judgment on the *point saved, nunck pro tunck,* for the Plaintiff.

See also 2 *Harr. & M'Hen.* 145, *per Hanson,* J.

*(a ) Johnson* Ch. J, had been counsel for the plaintiff.

or escheat, *without office found*, for the freehold is cast upon him by law. 3 *Com. Dig.* tit. *Grant, (G.)* 450, 451. *Cro. Eliz.* 508. 10 *Vin. Ab.* 145. *Sav.* 1, 8, 7. 9 *Co.* 95, *b.* 4 *Co.* 58, *a.* In the *seventh point*, said to be decided in the case of *Kelly vs. Greenfield*, the court only determined that the Proprietary did not acquire the same rights with respect to *Maryland*, which the king of *Great Britain* had in *England*. They determined negatively upon the rights acquired under the *fifth section* of the charter. The Proprietary certainly had the same, and more powers than any Bishop of *Durham* ever had. The *fourth section* of the charter gave him the same rights, and other sections gave him others, and more extensive powers. He had a right to *enact laws*, which the Bishop of *Durham* had not.

*Key* and *Harper*, for the Appellee. It is said that by the charter of *Maryland* the Lord Proprietary had all the rights of a Bishop of *Durham;* and it is contended that the Bishop of *Durham* had *regalia potestas in omnibus*, and therefore, that the Proprietary of *Maryland* had. No Bishop of *Durham* ever had *jurà regalia* more than to a certain extent. He had certain royal rights, and so had the Proprietary. It was inconsistent with the liberties of the people, that extensive powers should be vested in the Proprietaries. There could not be kings under kings. Whether the king himself could, in a case like the present, have the right of escheat without office found; and whether the Proprietary, upon the conviction and attainder of *Talbot* was entitled, under a prerogative right, to the moiety of the land for which the ejectment is brought, are questions for the consideration of this court. In the case of *Burgess vs. Wheate*, 1 *W. Blk. Rep.* 123, Lord *Mansfield* said, that an escheat is a reversion which takes effect in the lord by the failure of heirs. Escheat is one of the fruits and consequences of feudal tenure, whereby the land naturally results back, by a kind of reversion, to the original grantor or lord of the fee; but in order to

complete this title by escheat, it is necessary that the lord perform an act of his own, by *entering on the land* so escheated, or suing out a *writ of escheat.* It is in some respect a title acquired by his own act, as well as by act of law. The right by escheat is distinguishable from a prerogative right. 2 *Blk. Com.* 247. Upon an attainder, by prerogative, the king is to have all the lands, &c. For *petty treason the lands* go to the lord of whom they are holden, and the lord is in by escheat. 4 *Bac. Ab.* tit. *Prerogative,* 155. The right by escheat is a feudal, and not a prerogative right. A prerogative right is for the benefit of the people, and not for the king. When a right in escheat attached to the Lord Proprietary, he claimed it in a different manner from the rights which he acquired under the charter. In the year 1686, *Talbot* was convicted and attainted, and *eo instanti* the right of escheat, (if at all,) accrued to the Proprietary in the same manner as if *Talbot* had died without heirs. His Lordship being then in the Province, and not leaving it until 1688, the right vested in him at a time when he was present and capable of asserting it; not having done so, the statute of limitations commenced to run against him, and having once commenced, it never stops, but is a complete bar at the end of twenty years. So by analogy, possession held adverse for twenty years is a bar. The Proprietary, on rights acquired *in pais,* stands on the same ground as all other citizens. No lapse of time can bar one tenant in common, as against his co-tenant, so as to prevent his suing out his writ of partition, unless the possession of such co-tenant has been adverse and exclusive, or unless the right of entry of such tenant is tolled by descent cast under the statute of 32 *Hen. VIII. ch.* 33. *Lloyd vs. Gordon, et ux.* (2 *Harr. & M'Hen.* 254.) Circumstances may occur when one co-tenant may be barred by limitations. *Cowper,* 218. The Lord Proprietary was never considered a monarch. He held the province *as a subject* of the crown of *Great Britain.* There could not be two kings governing the same subjects at one and the

·same time.  The foundation of prerogative rights
in the Proprietary is said to flow from the charter.
There are no such rights vested in him by the char-
ter, even admitting the king could have vested any
such in one of his subjects.  The same rights were
given as had been vested in any Bishop of *Durham*,
and no Bishop of *Durham* ever had a right to make
laws, or to declare war or conclude peace.  They
never had *jura regalia*.  The king could vest no
such rights in a subject.  There was no oath of alle-
giance taken to the Bishop of *Durham*, nor to the
Proprietary of *Maryland*; nor had the Bishop of *Dur-
ham*, or the Proprietary, authority to forbid subjects
departing the country.  The king might restrain their
departure, that being one of his prerogative rights.
The press was under the control of the king, but not
of the Bishop of *Durham*, nor the Proprietary of
*Maryland*.  It would have been destructive to the in-
terest of the mother country if the power of declar-
ing war, or concluding peace, had been vested in any
one but the king.  The attorney general, however,
has contended that the proprietary had these powers
under the *twelfth section* of the charter, which gives him
"as full and unrestrained power, as any captain general
of an army ever hath had."  But it does not follow un-
der this grant of power that he had a right to declare
war or make peace; for there is no instance of a cap-
tain general of an army having the power, *as captain
general*, to do either.  The powers, granted under this
section of the charter were granted to guard against
and repel the *predatory incursions of the Indians, &c.*
and to prevent and to *suppress insurrections, &c.*  The
Bishop of *Durham* had no right to coin money, nor had
the Proprietary.  The Proprietary might sanction a
· law authorising the emission of a paper currency.
There are a number of other essential rights which the
crown has that were not granted to the Proprietary
by the charter.  The counties palatine were erected
for the purpose of *repelling invasions*; and courts
were established therein that suitors and witnesses
might not be *obliged to go to Westminster*, but remain·

at home to repel invasions, &c.   The Bishops of *Durham* had certain seigneurial rights, such as wards, marriage, escheat, &c.   Powers were granted to them to secure to the subjects more extensive liberties. The Bishop of *Durham* might have these rights without possessing a foot of land.   The attorney general has cited 6 *Vin. Ab. 575*, to show that the Bishop of *Durham* had royal jurisdiction and seigniory, and the same royal escheats which the king has.   Escheat is a feudal right, and is derived from the feudal system. They may be called royal escheats, and so the King's coat may be called a *royal coat*.   But this is only on account of the dignity of the person of the king.   He being royal all his rights must be royal.   The Bishop of *Durham* and the Lord Proprietary of *Maryland*, were both as much subjects of the King of *Great Britain* as any subject in *England* or *Maryland* was.   The remote situation of *Maryland* from *England* was the reason why certain extraordinary powers were granted to the Proprietary which were not granted to the Bishop of *Durham;* but none of the powers given to the Proprietary made him a king, or vested in him prerogative rights.   The powers of legislation, which were delegated to the Proprietary, and not to the Bishop of *Durham*, were for the benefit of the people of the province, and were conferred because of their remote situation from the mother country.   It was not in the power of the king to confer the right to declare war.   The province was granted to the Proprietary as an asylum to himself and a number of wealthy Roman Catholic subjects, who in the mother country were persecuted on account of their religious principles, but they were to continue subjects of the king notwithstanding such grant.   *"The reign of the Calverts"* is a new term, never heard of till introduced into this cause by the attorney general.   One of the first acts of the Proprietary was the establishment of a land office for the purpose of tenanting out his lands, which could not be done without such an office, and whenever there was an escheat he took the land under the feudal system, being a right acquired under

that system. He had no seignorial rights, and *nullum*
*tempus*, being a prerogative maxim, did not apply to
him. The king's revenue is derived, in part, from
the rents of his lands and for services performed. The
Proprietary of *Maryland* was never personally en-
gaged in legislation, nor in his courts. He could go-
vern by deputation, and he cannot be supposed to stand
in the situation of the king. The common law max-
im *"that the king can do no wrong,"* could not be ap-
plicable to the Proprietary, nor could the common law
be applicable to the charter granted to him. There
is no case wherein the courts before the revolution, or
since, decided that the Proprietary was not barred by
the statute of limitations. All the great officers of
the province were dependent upon him for their offices,
and particularly those of the court of the *dernier
resort;* and this might be the reason the question was
never determined either way. But if the question
has been so decided, it does not follow that it should
be so adjudged now, since our courts have made se-
veral decisions directly contrary to some made before
the revolution. The right of escheat in this case,
which accrued in 1686, was a right *in pais*, and Judge
*Blackstone* says the right of escheat is not a preroga-
tive right, but is a feudal incident entirely derived
from the feudal system, and belonging to every petty
feudatory who created subfeuds, and is not a royal
right. The Bishop of *Durham* had certain limited
royal rights, and so had the Proprietary, but they had
not all the royal rights of the king. 6 *Vin. Ab.* 575.
*Davis*, 62. They were subjects of *Great Britain*, ow-
ing allegiance to the king, as did those over whom
they presided. The parliament could create penalties
and annex forfeitures, taking away property, and
vesting it in the crown. 4 *Inst.* 204. 6 *Vin. Ab.* 575.
This shows that neither the Bishop of *Durham*, nor
the Proprietary, were sovereigns. The powers of so-
vereignty are incommunicable by the crown. Two in
the same government, having equal power of war and
peace, cannot exist. No power can be delegated to
the lesser which goes to destroy the greater. If co-

equal and co-ordinate powers cannot exist together; one must be superior. The crown is superior, and no powers are delegated but such as may be exercised with safety to the people, and security of the crown. The reason for establishing counties palatine, was different from that which occasioned the grant of the charter to the Proprietary. The king, it is admitted, has privileges, but to say that the Proprietary had them is a *petitio principii. Nullum tempus,* or exemption from limitations, is not a *jura regalia.* It is simply an incident to the *situation of the crown,* occasioned by the king's duties, and it was given him for the benefit of the people, that his revenues should not be diminished. His revenues were originally in rents, specifics and lands; and while he was at the head of his armies, or in the exercise of his royal functions, it was proper that his interests should be protected. It was a salutary and convenient maxim, when applied to the crown; and the attorney general would make the Proprietary a king, in order that it should be equally applicable to him. But the situation of the Proprietary did not demand the extension of this maxim to him. Original rights and escheat rights, as to the Proprietary, are different. The law is silent as to *nullum tempus* being applicable to the Bishop of *Durham.* The reason is, that it did not apply to him. He could not pardon under the statute of treasons.

There is however another view of this case. The murder of *Rousby* by *Talbot* was not an offence *against the laws of Maryland;* neither the indictment, nor any part of the proceedings, state it to have been a violation of those laws; and consequently there was no forfeiture of his lands in *Maryland.* Why forfeiture occurs, see 4 *Blk. Com.* 381. Whether this court can take notice of the conviction and attainder of *Talbot,* for an offence not committed within the province, but on a trial and conviction in *Virginia,* is a question for the consideration of the court. Even if the court can notice the record of the proceedings which took place in *Virginia,* yet, as the Bishop of *Durham*

was not entitled to forfeitures created by statute enacted after the grant, (4 *Inst.* 205, 216,) neither was the Proprietary entitled to those created by statute enacted after the charter. If the Proprietary did not claim under the forfeiture on the attaint of *Talbot,* as *proprietor,* and as one of his rights derived under the charter as count palatine, but merely as a *feudatory lord* of the fee, then he stood upon the same ground with any other lord of the fee, as a mere private individual, and in that capacity he might be barred by the statute of limitations. It does not appear that there was any act done by the Proprietary for a period of 100 years, to acquire a right under the escheat in this case.

*Martin,* (Attorney General,) in reply. It is of no consequence whether the title to the land in question fell to the Proprietary as chief of the Province, or in his political capacity of count palatine. "*The reign of the Calverts*" is a correct expression. It is no matter what a person is called, if he has powers; nor is there any thing uncommon that there should be more sovereigns than one governing in the same country. None but sovereigns have *jura regalia.* It is true the Proprietary may not have had them to the extent of the king from whom he derived them, yet he had them for all the purposes for which we contend. The state of *Maryland* has not the powers of war and peace, nor has it the same powers which were granted by the charter to the Proprietary. It has not the power to restrain the press, nor the power of *ne exeat* to prevent the departure of citizens, except in cases of debt. The proprietary always issued the writ of *ne exeat,* when necessary, and he had the right to wage war as captain general of the province; and the people owed to him the same allegiance which he owed to the king, and the same which the people of *Maryland* now owe to the state. There may be two allegiances, as is the case of the citizens of *Maryland,* who owe allegiance to the state, and to the *United States.* So also formerly the subjects of the

province owed allegiance to the Proprietary and to the king of *Great Britain.* The lands in the province were held by fealty from the Proprietary, and the same fealty which he owed to the king, did the people owe to him. The king could not direct any subject of the province to take up arms, or to pay any thing towards the wars which he carried on in *Europe.* It was under the power of the Proprietary, and his government alone, that money was raised to support any such wars. It is a strange doctrine that the king could annul the charter, or pass laws to govern the people of the province. It was his attempt to do so that caused us to declare ourselves independent. The counties palatine, it is true, were created on the frontier to repel invasion, and for that purpose powers were given to the Bishop of *Durham;* and if so, it was the more necessary that such powers, and greater, should be given to the person who was to rule and govern this country. The Proprietary, under the *seventh section* of the charter, had a right to make laws with the assent of the delegates, &c. and to cause those laws to be enforced. He had a negative upon all laws enacted by the assembly. All lands were held from him as being the original holder, and all titles thereto emanated from him. Under his authority treason was tried and criminals condemned. He had the right to pardon, and so had the counts palatine. Every power which was necessary for a petty prince to enjoy, the Proprietary did possess and enjoy in the province. That he did possess all the royal rights which had ever been granted to any Bishop of *Durham,* and more, the *fourth section* of the charter evidently shows. He was entitled to all escheats, and so were the counts palatine, and that they did enjoy *jura regalia* as fully as the king does, is manifest from all the authorities which have been cited. They could hold courts of justice, &c. and had all the royal rights of seigniory which the king had. The right to declare war and conclude peace, did not endanger the rights of the subjects; nor was there any power given or right conferred on the Bi-

shop of *Durham,* or the Proprietary, which abridged
the right of the subjects, or endangered the authority
of the king. The additional powers given to the Pro-
prietary, under the *seventh section* of the charter, to
make laws, &c. were not necessary for the counts
palatine to possess. The king's writ did not run in
the counties palatine, except writs of error; but the
laws of the realm operated therein, and were appli-
cable to the situation of that part of the kingdom.
The *twenty-second section* of the charter directs that
courts shall construe the sense and meaning of every
word, clause, or sentence thereof, most favourably
and beneficially for the Proprietary.

The question upon the subject of the convicti-
on of *Talbot,* was decided in the case of *Thomas's
Lessee vs. Hamilton,* (1 *Harr. & M'Hen.* 190,) and
this court is bound by that decision. It has been
stated that the offence was not committed in *Maryland,*
and that the trial and conviction took place in *Vir-
ginia.* There was no necessity that either the offence
or the conviction should have been in *Maryland.*
It was only necessary that the person attainted should
have property here. The offence of mortally stab-
bing another is punished as murder. 4 *Blk. Com.*
198. And in an indictment for stabbing it need not
be laid that the offence was committed *contrary to the
form of the statute.* It is an indictment at common
law, and need only be laid within the statute. If an
offence was committed in any part of *England,* by a
person having land in a county palatine, the land was
forfeited to the Bishop of *Durham.* All the land which
*Talbot* held was forfeited upon his conviction and at-
tainder, no matter where it lay, if it was within any
of his Majesty's dominions. Whenever a British
subject is convicted and attainted, the benefit of the
forfeiture went to the person who made the grant. It
was of no consequence where the party died, if he
left no heirs, his lands in *Maryland* escheated to the
Proprietary. A subject of *Great Britain,* if convicted
and attainted, forfeits his real estate, because his blood
is corrupted, (unless particular laws provide against

it,) and it escheats and falls back to the lord of the fee. The trial and conviction in *Virginia* will as effectually cause a forfeiture of all lands held by *Talbot* in *Maryland,* as if they had taken place in *Maryland*; for the British laws extended as well to *Virginia* as they did to *Maryland*. If the statute of 1 *Jac. I. ch.* 8, respecting *stabbing,* had existed during the time of the Bishops of *Durham,* they would have been entitled to all forfeitures which might have accrued under that statute, of lands lying within the counties palatine. It may be admitted, that the land for which this ejectment was brought fell to the Proprietary by escheat. There are two kinds of seigniories, one a royal, and the other an inferior or feudal seigniory. The first appertains to the king, and the latter to a subject holding under or deriving his title from the king. The counts palatine had royal seigniory as well as the king. *Talbot* held under the Proprietary by fealty only, and upon his conviction and attainder, his lands went to the Proprietary by escheat, and he held it, as Proprietary, in the same manner as if it had never been granted. The king claims escheat under his royal seigniory, and so did the Proprietary. He could not be disseised, and it is strange and absurd to suppose that he could. All the lands were held under him, and all right to the soil was derived from him. The holders were his tenants, and if they were turned out, the dispossessor only substituted himself in the place of the tenants. If a tenant is turned out, and the party dispossessing him renders the same rent, and it is accepted, the Lord acknowledges him as his tenant. It is not the Lord who is disseised; it is the tenant. It cannot be said that the Proprietary could be disseised; and unless a tenant could be substituted in the place of the Proprietary, to hold the province under the king, there could be no disseisin. There was no more necessity for the Proprietary, or his officers, to enter upon the land escheated, than there was to enter upon any land which he had never granted; nor was there any occasion for the surveyor, under the escheat warrant,

SEPT. 1800

Russell
vs.
Baker

to survey the land, for the escheat grant would have the effect to grant the original tract by the same metes, and bounds, and quantity. In the case of *Greaves vs. Dempsey,* (1 *Harr. & M'Hen.* 65,) 'the special verdict expressly finds that there was no inquisition or *office found* of the escheat, and yet the person under the escheat grant from the Proprietary, recovered. The lease from the Proprietary to *Thomas,* it is true, was not made until the year 1748, and the escheat had fallen in 1684, when the offence was committed by *Talbot;* and as the Proprietary had no knowledge of the conviction and attainder of *Talbot,* until 1717, the statute of limitations, if it had the effect to bar, did not begin its operation until then, if the Proprietary was in the Province; but it is in proof, and so stated in the record, that he was absent from the Province, *beyond the seas,* from the year 1688 until 1732, during which time, or a greater part of it, the government of the Province was in the hands of other persons who had taken possession of it by force. The Proprietary therefore, when he made the lease in 1748, could not have been barred by limitations, admitting, for a moment, the principle that he could be so barred at all; for he was not bound to know of the conviction and attainder of *Talbot,* until a record thereof was made in the Province in 1717, and at that time he was beyond the seas, and therefore was then within the saving of the statute. *Nullum tempus occurrit regi,* is a maxim which the British laws have always recognised, and it is a privilege always given to the ruling power. If the Proprietary had held lands in *Virginia,* he would have stood in the same situation as a private individual; and so the king, if he holds land in France, or in any other country not governed by him, he holds it merely as a citizen of France, or the country in which such land is situated. If the king, before *Wales* and *Scotland* were governed by him, was not bound by the statute of limitations when he held but little property therein, how much more ought the chief of a large wilderness of country, as this state was at that time of day, to be entitled to the same privilege.

In *England* the statute of limitations is not pleaded in bar to a debt on bond; but the jury may presume, if the bond be of long standing, that it has been paid and satisfied, or otherwise extinguished. By the extension of the statute of *James* to this country, it does not necessarily follow that its provisions were extended so as to affect the ruling power of this country. It can never be said that the ruling power is to be barred or affected by a statute, unless there be a special provision for that purpose. It has been decided in suits upon sheriffs bonds, (which are limited by the act of *July* 1729, *c.* 25, §. 3, to five years,) that the Proprietary, not being named in that act, could not be bound by it. This case should now be decided as it would have been before the revolution, otherwise revolutions would be curses instead of blessings. The counsel in the case of *Kelly vs. Greenfield,* never thought that the Proprietary stood in the same situation as a private individual; nor did they so contend. They argued upon the ground of the escheat fallen, and contended that it had never been the rule for an escheat patent to relate back to the original certificate, so as to overreach mesne grants; that it only had such relation, where there had been no intermediate grants to others, for the same land; and that after the lapse of *sixty years,* the court of chancery would not interfere to repeal the grant on account of fraud or deception in obtaining it of the proprietary; so that relief could be procured only at law. If the court in that case considered themselves bound to decide on all the points raised in the cause by counsel, whether material or not to its final decision, why was one of the points or questions unanswered, which from the opinion we have, appears to have been the case? The Proprietary, it has been said, ought to be barred, because he never busied himself in the affairs of the province, but acted by his officers. It is precisely the same case with the king, who conducts his affairs by his officers. But with respect to the Proprietary, we have record evidence, that *Charles,* Lord *Baltimore,* then the Proprietary, presided in person

in the assembly, and in the courts in the years 1676, and from 1681 to 1688. *(4 Harr. & M·Hen.* 477, and *Bacon's Laws of Maryland.)*

If the general court were right upon the *first bill of exceptions* in this case, it was needless for the plaintiff to go into any other evidence. But should this court consider the opinion expressed in that exception to be erroneous, then the judgment must be reversed, and the cause remitted for a new trial. It is therefore unnecessary to take up the time of the court in arguing the *second bill of exceptions.*

*Harper.* The judgment ought not to be reversed if the opinion in the *second bill of exceptions* is correct. If this court is of opinion that the lessee is barred after the year 1748, the judgment cannot be reversed; or if the opinion expressed in either of the bills of exceptions is correct, the judgment cannot be reversed; for there is no possession located on the plots so as to clear it of limitations. The plaintiff, if he can shew possession, may bring a new ejectment, and the decision in this case cannot affect him. He might have moved for leave to withdraw a juror, so as to lay down his possessions.

In the case of the *Proprietary vs. Bond,* *(*1 *Harr. & M·Hen.* 210,*)* it was decided, that the Proprietary was barred by limitations, not having brought the action, being on a sheriff's bond, within five years. The action was to recover money due to the public for ordinary licenses received by the sheriff.

*Martin,* (Attorney General.) He knew the judges of general court held themselves bound by the supposed decision in the case of *Kelly vs. Greenfield.* He therefore deemed it needless to instruct his client to have his possessions located on the plots. In the case of *Tasker vs. Whittington,* (1 *Harr. & M·Hen.* 151,) the provincial court decided, that the Proprietary was not barred by adverse possession. Similar decisions, he is satisfied, often took place in the courts of the province, if the question was raised. See *Lord Baltimore's Ex'x. vs. Huett,* 4 *Harr. & M·Hen.* 482.

Sept. 1800

Russell
vs.
Baker

THE COURT OF APPEALS, at June term 1804, *affirmed* the judgment of the general court, concurring with that court in the *opinions* expressed in both of the bills of exceptions.

---

### GENERAL COURT, (E. S.) SEPT. TERM, 1800.

### FRAZIER vs. HYLAND.

*Where A being indebted to B for goods sold on a credit, for which, according to the custom of merchants, interest was to be charged, and A afterwards pays the amount of the principal without directing how it was to be applied, such payment is to be applied first to the discharge of the interest due, and then the balance to the discharge of the principal.*

ASSUMPSIT for money due for goods, wares and merchandizes, sold by the plaintiff to the defendant. The plaintiff was a merchant of Baltimore, and the defendant a retail merchant of Somerset county. It was admitted, on the part of the defendant, that it was the *custom* of the *merchants* of Baltimore, when retail merchants in the country bought goods of them, on credit, after the expiration of *six months* credit, to charge interest on the principal sum due for such goods, calculating such interest from the expiration of the said six months. It appeared in evidence, that the plaintiff had drawn an order on the defendant for 220*l*, the amount of the sale of said goods, and of the interest charged, according to the admitted custom of charging it. The defendant refused to accept the order; but on a subsequent meeting of the plaintiff and defendant, the latter agreed to accept an order for 198*l*, that being the principal due, without interest. From this it appeared, that the only subject of dispute was the claim of interest.

*J. Bayly*, for the defendant, moved the court to direct the jury, that if they should be of opinion from the evidence, that the *principal* sum was paid, the action could not be sustained for the interest.

THE COURT said, that as there was no evidence of the *application* of the payment, they would direct the jury that the payment in such *case* was to be applied, first to the discharge of the interest due, and then the balance to the discharge of the principal. Verdict for the plaintiff.